SCHEIBECK *v.* VAN DERBECK.

1. EVIDENCE—LETTERS AND TELEGRAMS—MATERIALITY.

It is not error to exclude from evidence letters and telegrams which merely tend to prove admitted facts, and do not relate to the vital question in controversy.

2. CONTRACTS — EMPLOYMENT OF BASEBALL PLAYER — AGENCY— ESTOPPEL TO DENY.

Where the manager of a professional baseball team referred a player to the captain of the team, with the statement that the captain was his sole manager, and whatever he did "went," he is bound by a contract for the employment of the player, entered into by the captain on his behalf, whether or not the captain had authority from him to make it.

Error to Wayne; Donovan, J. Submitted October 25, 1899. Decided November 22, 1899.

*Assumpsit* by Frank Scheibeck against George A. Van Derbeck on a contract of employment. From a judgment for plaintiff, defendant brings error. Affirmed.

*George X. M. Collier,* for appellant.

*Sloman & Groesbeck,* for appellee.

HOOKER, J. The plaintiff commenced an action in justice's court to recover an amount alleged to be due him under two alleged contracts for his services as a ball player. His bill of particulars contained two items, viz.:

May 29. Services and labor rendered as per contract
with the defendant......................... $119 28
June 18. Upon express promise of Con Strouthers, captain and manager of Detroit B. B. Club, and agent for the defendant, to pay salary while plaintiff remained physically incapacitated. 170 40

Total................................. $289 68

The defendant filed with his plea a notice of set-off

amounting to $76.50. The plaintiff recovered a judgment for $199.51, and the defendant appealed to the circuit. The record states that, upon the trial at circuit, "judgment was duly entered on verdict for plaintiff, on October 25, 1898," but is silent as to the amount. So, also, is appellant's brief. The appellee's brief states that the judgment at circuit was $143.11, and was made up of the first item of $119.28, with interest. He is corroborated in this statement by:

1. A computation.
2. The *præcipe* for execution.
3. The charge of the judge, which says that the plaintiff's claim is $119, with interest, and that the dispute in the case arises over an alleged payment of $75.
4. A request on behalf of the plaintiff that the jury must find a verdict for the plaintiff for $143.11, unless they find that the defendant is entitled to a set-off, and a further request to instruct the jury that there cannot be a recovery upon both items of the plaintiff's bill of particulars.

We are therefore justified in finding that the first item only was allowed, and that the set-off was not allowed.

The item of $119.28 arises under a written contract, whereby the defendant hired the plaintiff to play ball at a price named, and there is no question but that such sum was earned on May 29th, when the plaintiff was discharged. The set-off is based upon a claim that, at the time the contract was made, plaintiff was under contract with the Washington, D. C., Club, and that both parties to this suit desired his release, which was procured and paid for by the defendant. The defendant asserts that it was agreed that the plaintiff should reimburse him to the amount of $75, while the plaintiff says that he did so upon condition. On his cross-examination, he testified upon this subject as follows:

"During April I was to get myself in condition to play schedule games with the Detroit Club, which commenced May 1st. The regular schedule games commenced May 1st. While playing a practice game in April, I was first

injured.   The first game was played on May 1st in
Detroit, with the Toledo Club.   I was again injured on
that day, and from the 2d of May until the 29th of May I
did not play with the Detroit Club.   I do not know when
Van Derbeck procured my release from the Washington
Club.   I know Washington still had a claim in April
against me.   I wanted it off, as I wanted to stay in
Detroit.   At the time I got the $100 I told Strouthers and
Van Derbeck I was anxious to get the same.   When I
signed the contract I was still owned by the Washington
Club.

"*Q.* Did you make any proposition to Mr. Van Derbeck
to buy your release?

"*A.* In a way.   If you want me to tell it, I will.   I
met him.   I do not know whether in his office or out in
front.   I said, 'Van, if you can buy my release from the
Washington Club, I will give you $75 or $100 towards the
money you pay for me if I sign;' and he said he would
let me know, and that is all there was between him and
me.   I had a talk with Strouthers.   He came up and saw
me.   After that I never had another talk with Van Der-
beck about getting my release from the Washington Club.

"*Q.* You never had another talk with Van Derbeck?
Did you testify as follows in the justice's court:

"'*Q.* I would like to ask you if you had any talk with Van Derbeck
after the time at which this question of $75 was discussed between
you and Mr. Strouthers and the time when you went to receive
your pay.

"'*A.* I do not know anything of it.   I believe I had a little talk
with him.   I told him I would like to play with the club; I would
like to stay here; I did not like to go back to Washington, if I was
playing good ball.   I said to him, if he would buy me, I would give
him $75 towards the money paid to the Washington Club, and I
told Van Derbeck that, and also Mr. Strouthers.'

"*A.* I told Mr. Strouthers—
"*Q.* Did you so testify in the justice's court?
"*A.* I had one talk with Van Derbeck.
"*Q.* Did you so testify in the justice's court?
"*A.* I testified I had a talk with Van Derbeck regard-
ing my release from the Washington Club, and I made
the proposition I have just testified to,— that, if he bought
me and paid for me, I would pay $75 or $100 towards the
money that he paid for me; and then he said he would let
me know.   I was paid on the 15th of May.   Van Derbeck

paid me, and at that time he asked me to deduct the $75. I told him if he deducted the $75 I would hold him to his contract with me that Mr. Strouthers had made with me as sole manager at the time. I did not tell him that I didn't want it deducted at the time because I was hard up.

"*Q.* Let us have what was said on this 15th of May, when you went there to get your pay.

"*A.* Well, he paid me, and he drew up a check for $27 and something, and he asked me about the $75, and I told him I did not think he ought to take it out now. I was under the impression I would get pay as long as I was disabled, which my contract called for under Mr. Strouthers as manager, and that is what I told him. I wanted to use the money.

"*Q.* What was your talk then with Mr. Strouthers?

"*A.* Well, Mr. Strouthers came up to the house to see me, when I was laid up with my leg, and he came in, and asked me how I was, and I told him I was in pretty bad shape. He said, 'I have just bought Mr. Nicholson;' and he says, 'I have got a chance to buy you;' and he says, 'How are you feeling?' and I says, 'Pretty bad;' and he says, 'What did the doctor say?' and I said, 'He says I may be able to play in 10 days, and may not be for six weeks;' and he says, 'Are you willing to give this $75 and get the release?' and I told him I did not see how I could; and he said to 'never mind, old boy, take care of yourself, and you will be paid as long as you are disabled.' I says, 'If that is the case, you can take out the $75.'

"*Q.* Now, when you received the money, on the 15th, did you tell Mr. Van Derbeck the conditions under which you were to pay that $75?

"*A.* No, sir; I did not see why I should; he had his manager. On the 29th of May, when I received my release, I told Van Derbeck, 'If you take this $75 out of my salary, I will sue you under that agreement I had with Strouthers.' Van Derbeck wanted me released, and offered me a check for $40. I wanted what I had actually coming, $119; he wanted to deduct the $75.

"*Q.* And you were the man that got the benefit of this release from the Washington Club, were you not?

"*A.* Certainly not; I lost a month's salary.

"*Q.* You got the benefit of your release from the Washington Club?

"*A.* In what way?

"*Q.* In that you could contract with another club if you wanted to?

"*A.* I could not until the season was finished with Van Derbeck.

"*Q.* You were released on the 29th; after that you could contract with anybody else?

"*A.* I suppose so; I suppose if a man is out of a job he can go wherever he wants to; I think so.

"*Q.* So that what you tell the jury is that Mr. Strouthers said we would pay you $8.52 a day as long as you were disabled,—at that rate?

"*A.* He would pay me as long as I was disabled. There was nothing said as to the length of time which I might be disabled. If I was disabled all summer, I was under the impression I would get my salary until the end of the season.

"*Q.* You were to have your salary all this month, if you gave $75?

"*A.* If I was not able to play I was to have that salary.

"*Q.* For how many months?

"*A.* As long as I was not able to play.

"*Q.* How long is the season?

"*A.* Five months.

"*Q.* So that you would have $255 a month, for the season, if you were not able to play?

"*A.* I understood that; sure I did. I was to have all that by paying $75. Strouthers thought I was going to play in 10 days; so did everybody else; and I hurt myself again. Nobody could tell how long it would last. It might be 10 days, two weeks, or a month. I want my 14 days' pay.

"*Q.* But you do not want to pay the $75?

"*A.* If you want my $75, I have a right to the rest of it, according to his agreement with me."

Redirect examination:

"Mr. Van Derbeck told me to go to Strouthers.

"*Q.* Before you made any contract?

"*A.* Yes, sir; he told me Mr. Strouthers was the sole manager, and whatever he done went. I got able to play again about the 20th or 25th of June. I went with the Toledo Club, which were transferred the same day, and I went with them to Terre Haute. After that I went with the Washington Club, and finished the season with them, up to October 1st."

We are satisfied that this testimony made it necessary

to leave to the jury the question of Strouthers' authority, and the determination of the facts in relation to the talk with Strouthers.

We think, also, that it was proper for the learned circuit judge to limit the jury to a consideration of the $75 item, and that the case should not be reversed because he mentioned it as the "$75 payment *alleged* to have been made to a club in Washington," etc.

A number of assignments of error relate to the exclusion of testimony which the defendant's counsel offered, and which, it is said, tended to support the defendant's claim of set-off. Taking them in their order, they were as follows: Exhibit C, a telegram reading: .

"Mar. 15th, 1895.    CINCINNATI, O., 15.
"To G. A. VAN DERBECK:
"You may sign Scheibeck providing Washington Club gives consent.                    B. B. JOHNSON."

For this it is claimed that it shows that the assent of the Washington Club was necessary before the contract could be made. We are not pointed to any testimony which shows who Johnson was, or why such consent was necessary. If there is any proof upon the subject, it is to be found in the testimony of the parties, where they . seem to have recognized the desirability — or, possibly, necessity — of a release. This exhibit, however, throws no light upon it, nor does it show that a consent was obtained. Several letters and telegrams were offered showing negotiations in relation to this subject, but they prove no more than the admitted facts, viz., that defendant paid $300 for the release of the plaintiff and another player by the Washington Club. It was clearly proved that the $75 was paid, and the charge does not indicate to the contrary. The vital question was whether the defendant had a right to charge it to the plaintiff.

We do not agree with the defendant that the writings show an obligation upon the part of the plaintiff to Washington. The most that could be claimed is that they show such a claim on the part of the Washington Club, which

is no more than unsworn hearsay testimony of the fact that counsel maintains that they prove. Nor do their dates show that plaintiff saw them or knew anything about them.

The defendant was asked to describe the scope or extent of Strouthers' authority, and his duties, and an objection was sustained. Had the case depended upon that, it may be that the defendant might complain; but the plaintiff's case rests upon the statement that the defendant gave him the right to understand that he could contract with Strouthers in relation to the matter. He did not say, "Strouthers was defendant's manager, and therefore I had a right to deal with him," but that "I tried to contract with the defendant, and he referred me to Strouthers, and said, 'Strouthers is my sole manager; whatever he will do will be business with you;'" and, again, "He told me Strouthers was the sole manager, and whatever he done went." This, if true, was binding upon defendant, whether Strouthers was his sole manager or not.

We find no error, and the judgment is affirmed.

The other Justices concurred.